```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

United States                  :
                               :
v.                             :      No. 3:02cr7(JBA)
                               :
Jose Antonio Perez             :
```

### Ruling on Jose Antonio Perez's
### Motion for Judgment of Acquittal

Following a jury verdict of guilty on all five counts of the indictment against him (arising out of the murder of Theodore Casiano),[1] Jose Antonio Perez moves for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c). In his motion, he argues that the evidence was insufficient to show that he: (1) participated in a conspiracy to commit murder-for-hire under 18 U.S.C. § 1958, because the federal crime was already completed at the time the Government's evidence showed his involvement began; (2) used an interstate facility; (3) aided or abetted the commission of a murder; or (4) did so with the purpose of maintaining or increasing his position within the VICAR enterprise termed "the Perez Organization."

As the defendant's motion recognizes, a defendant making a Rule 29 sufficiency of the evidence "bears a heavy burden," United States v. Velasquez, 271 F.3d 364, 370 (2d Cir. 2001)

---

[1] The indictment charged Jose Antonio Perez with conspiracy to commit interstate murder for hire, interstate travel murder for hire, interstate facility murder for hire, VICAR murder, and using and carrying a firearm in relation to a crime of violence.

1

(quotation omitted), because the Court must "consider[] all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government," United States v. Griffith, 284 F.3d 338, 348 (2d Cir. 2002) (citing United States v. Naiman, 211 F.3d 40, 46 (2d Cir. 2000)).

> [The Court] defer[s] to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence. [The Court] will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. These principles apply to both direct and circumstantial evidence.

Id. (citing United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998); United States v. Feliciano, 223 F.3d 102, 113 (2d Cir. 2000); and United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001)) (quotations omitted).

**A.  Counts One through Three — Sufficiency of the Evidence**

Defendant argues and the Government agrees that the core of 18 U.S.C. § 1958, the federal murder-for-hire statute, is its prohibition of interstate travel or the use of an interstate facility with the intention of committing a murder-for-hire.[2] As

---

[2] While the murder itself need not be an element of the offense, as the statute criminalizes the interstate travel and use of an interstate facility with the intention of committing murder-for-hire even if no injury or death results, the penalty increases from a maximum of ten years imprisonment to life imprisonment if "death results." See 18 U.S.C. § 1958. In this case, the death of Teddy Casiano was charged as an element of the

2

the Eighth Circuit has explained, "Section 1958(a) is not a murder statute; it is a carefully drafted federal criminal law of constitutionally limited scope." U.S. v. Delpit, 94 F.3d 1134, 1150 (8th Cir. 1996). "The gist of the offense is travel in interstate commerce or the use of facilities in interstate commerce or the mails with the requisite intent and the offense is complete whether or not the murder is carried out or even attempted." Id. (quoting Senate Rep. No. 225, 98th Cong., 2d Sess. 306 (1984), reprinted in 1984 U.S.C.A.N. 3182, 3185).

Defendant argues that the evidence was insufficient as to Count One, conspiracy to commit murder-for-hire, because "there was no evidence presented at trial that he had anything to do with hiring the hit men in New York, or that he did anything to 'cause' or assist them in traveling from New York to Connecticut. Rather, defendant urges, according to the government's theory of the case and the evidence it presented at trial, Tony Perez's only participation in the conspiracy occurred after the hit men had been hired, after they traveled in interstate commerce from New York to Connecticut, and after they had arrived in Hartford to commit the murder." Defendant's Supplemental Memorandum of Law in Support of Rule 29(c) Motion for Judgment of Acquittal [Doc. # 864] at 8-9. Thus, defendant contends that the crime under 18 U.S.C. § 1958 was complete by the time he became

---

offense.

involved.

Defendant's argument is based on the mistaken assumption that no conduct falling within the scope of the federal murder-for-hire statute occurred after the New York participants traveled to Connecticut on May 23, 1996. The testimony at trial belies this assumption. Ollie Berrios testified that on the early afternoon of May 23, 1996, he, Santiago Felciano, Mario Lopez, and Fausto Gonzalez arrived at Perez Auto, where he introduced them to Wilfredo and Jose Antonio Perez. At that time, Jose Antonio Perez became involved in the selection of the murder site, which needed to be far enough away from the shop so as not to implicate the Perezes yet close enough for the out of town contract killers to navigate to and from without losing their way:

> Q: And what did Wil say about where the shooting should take place?
>
> A: That he didn't want the shooting too close to the garage.
>
> Q: And what did you say about where the shooting should take place?
>
> A: We can – I understand that, but we can't go too far away with the guys that are not familiar with the area.
>
> Q: Did Tony participate in the conversation?
>
> A: Yes.
>
> Q: What did he say?
>
> A: He trying to, you know, say we can take another – go some – another way, too. * * * He explain, like

take another road away, use another escape.
Trial Transcript Vol. VIII [Doc. # 621] at 1717.
When Teddy Casiano did not arrive at Perez Auto on that day, Wilfredo Perez proposed that the individuals from New York stay that night in a hotel, and was told that they could not stay in Connecticut. As a result, Berrios, Feliciano, Lopez, and Gonzalez returned to New York, before again crossing state lines back into Connecticut the next day. See id. at 1719. On May 24, 1996, Berrios, Feliciano, Lopez, and Gonzalez returned to Perez Auto and again talked with Wilfredo and Jose Antonio Perez. Berrios observed Wilfredo and Jose Antonio go into the front of the garage to make a telephone call, and Wilfredo came back and told Berrios that they paged or telephoned Teddy Casiano in order to summon Casiano to the garage.³ See id. at 1722-23. Jose

---

³Testimony by Maritza Alvarez, Teddy Casiano's girlfriend, established that on the day of Casiano's murder Jose Antonio Perez called Casiano, leaving a message on the answering machine at his home that Alvarez heard, saying, "Teddy, it's me, Tony." "Can you give me a call, we need you to come down to the shop." Trial Transcript Vol. IX [Doc. # 622] at 1994. Alvarez also testified that Casiano received a page from Jose Antonio Perez. See id. at 1997 ("A. . . . I noticed that the machine was blinking again, so I played the message, and it was Teddy on the answering machine. Q. And what did the message say? A. 'Hey, what's up? You paged me and you are not picking up the phone. Well, give me a call. Call me back. I'm going to Perez Auto because Tony beeped me.'").

Mario Lopez testified about his memory of the "owner" of Perez Auto, whom he identified from a photo array as defendant and described as a Hispanic man with "Indian color" skin tone "meaning a little darker, dark skin, like an all year-round tan," "a long ponytail, black hair," "approximately around 5'10, about 200 pounds," who was wearing jeans, motorcycle boots, and a

Antonio Perez then agreed to allow Berrios to use his car (which had tinted windows) for the post-murder drive back to New York. See id. at 1724.

The § 1958 offense thus occurred over a span of at least two days in May 1996. At the time Jose Antonio Perez became involved on the afternoon of May 23, 1996, the crime was not complete; the New York participants had yet to return to New York and travel back to Connecticut to commit the murder-for-hire, and phone calls effectively luring Casiano to Perez Auto had not yet been made. The evidence supports the inference that on May 23, 1996, the conspirators agreed that the contract killers would travel from New York back to Connecticut on May 24, 1996 to carry out the planned murder of Teddy Casiano. The evidence that Jose Antonio Perez discussed an escape route with the contract killers, called Casiano to lure him to Perez Auto, and offered the use of his Cadillac as a getaway car, provided a sufficient basis for the jury to find that Jose Antonio Perez had knowledge of both aims of the § 1958 conspiracy, namely, to commit the murder for hire of Teddy Casiano by interstate travel and by use of an interstate facility, and that he willingly participated in

---

leather vest. Trial Transcript Vol. VI [Doc. # 619] at 1283. Lopez testified that he saw the "owner" of Perez Auto using a phone in the work area of Perez Auto, and that the "owner" then told him that "he couldn't get ahold of the victim." Id. at 1290. The next day, after they returned to Perez Auto, the "owner came into the office," and "said he was going to make a few phone calls to try to locate the victim." Id. at 1297.

that conspiracy with the intention of aiding in the accomplishment of its goals.  This evidence was also sufficient to find Jose Antonio Perez guilty of the substantive crimes of murder-for-hire by use of interstate travel and of murder-for-hire by use of an interstate facility charged in Counts Two and Three of the Indictment.[4]

### B.  Count Three — Use of an Interstate Facility

Defendant argues that his role was very similar to that which was found insufficient to support a conviction under § 1958 in <u>United States v. Delpit</u>, 94 F.3d 1134, 1150 (8th Cir. 1996). In <u>Delpit</u>, defendant Chanise Lynn was recruited on August 26 or 27 to serve as the driver for Delpit, the hitman.  Delpit, however, had traveled from Los Angeles to Minnesota, the location of the killing, on August 24, prior to Delpit's recruitment, and the Eighth Circuit thus concluded that "[b]y this point . . . the § 1958(a) violation was already complete."  <u>Id</u>. at 1150. "Because the crime was complete when Delpit arrived in Minnesota, Lynn did not — she could not — aid and abet the crime's perpetrators.  If

---

[4] Count Two charged defendant under a Pinkerton liability theory, in which the Government was required to prove that the defendant was a member of the charged conspiracy and that the substantive crime of interstate travel murder-for-hire, committed by a co-conspirator, was a reasonably foreseeable act in furtherance of the unlawful conspiracy.  Count Three charged that the defendant himself committed the substantive crime of murder-for-hire by use of an interstate facility.  The evidence discussed above supports the jury's findings on each of these substantive counts.

anything, she was an accessory after the fact (for which she was not charged)." Id. Here, in contrast, a reasonable jury could infer from the evidence presented at trial that after Jose Antonio Perez joined the conspiracy, the conspirators agreed that Gonzalez and Lopez would travel again from New York to Connecticut to carry out the plan to murder Teddy Casiano, and that Jose Antonio Perez telephoned (using an interstate facility) Casiano to lure him to Perez Auto where the hired killers could see him and follow him.  Unlike Delpit, here the dual purposes of the conspiracy — to commit the murder-for-hire of Teddy Casiano by use of interstate travel and an interstate facility — were pursued after Jose Antonio Perez became involved.  Defendant also argues that the evidence fails to establish the use of an interstate facility, because there was no evidence that the calls Jose Antonio Perez made to Teddy Casiano were routed across an interstate network.  Defendant relies on United States v. Weathers, 169 F.3d 336, 339-343 (6th Cir. 1999), cert. denied, 120 S. Ct. 101 (1999), United States v. Paredes, 950 F. Supp. 584, 589 (S.D.N.Y. 1996), and United States v. Stevens, 842 F.Supp. 96, 98 (S.D.N.Y. 1994), which held that in order to establish the court's jurisdiction under 18 U.S.C. § 1958 (a), the government must show that the defendant's phone call traveled across state lines, not merely that the phone company which routed the defendant's call generally engaged in interstate

commerce. The district court in <u>Paredes</u> concluded, for example, that under U.S.C. § 1958(a), the interstate nexus requirement turns not on the facility's interstate capacity but its actual use in the particular case and that "the focus should be on the location of the communicating parties," not "the manner in which the communication facility operates". <u>Paredes</u>, 950 F. Supp. at 589.

    Title 18 U.S.C. § 1958(a) provides:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both . . . .

Subsection (b)(2) specifies that the phrase "facility of interstate commerce includes means of transportation and communication."  The court in <u>Weathers</u>, observing the distinction between the phrase "any facility <u>in</u> interstate or foreign commerce" in describing the substantive crime in subsection (a) of § 1958, and the phrase "facility <u>of</u> interstate commerce" in subsection (b)(2), concluded that "the two phrases . . . encompass different categories of activity," and that the phrase "'facility <u>in</u> interstate commerce' is best interpreted as Congress's attempt to regulate the use of the channels of interstate commerce," and the phrase 'facility <u>of</u> interstate

9

commerce' as an attempt to regulate the instrumentalities of interstate commerce."[5] Weathers, 169 F.3d at 341-42.

The majority of circuit courts considering this issue, however have rejected the Sixth Circuit's approach, concluding that § 1958 is aimed at regulating the "instrumentalities of interstate commerce" even if the particular use of the facility at issue does not involve the crossing of state lines. See United States v. Marek, 238 F.3d 310, 313 (5th Cir. 2001) (en banc) (holding that "§ 1958's use of a 'facility in interstate commerce' is synonymous with the use of an 'interstate commerce facility' and satisfies the jurisdictional element of that federal murder-for-hire statute, irrespective of whether the particular transaction in question is itself inter state or wholly intra state.") (emphasis in original); United States v.

---

[5]Weathers attempted to place the two subsections into two different categories of regulation of interstate commerce approved by the Supreme Court. In United States v. Lopez, 514 U.S. 549 (1995), the Supreme Court analyzed the scope of Congress's power under the Commerce Clause with respect to regulation criminal activity, and declared that:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

Id. at 558-59 (citations and quotations omitted).

Richeson, 338 F.3d 653, 660 (7th Cir. 2003)("We wholly agree with the Fifth Circuit that § 1958's construction, plain language, context in the realm of commerce clause jurisprudence, and legislative history all lead to the conclusion that 'it is sufficient [under § 1958] that the defendant used an interstate commerce facility in an intra state fashion.'")(quotation omitted).  The Second Circuit rejected a similar challenge to the federal mail fraud statute by holding that the mail fraud statute prohibits "intrastate mailings sent or delivered by private or commercial interstate carriers" because "private and commercial interstate carriers, which carry mailings between and among states and countries, are instrumentalities of interstate commerce, notwithstanding the fact that they also deliver mailings intrastate." United States v. Gil, 297 F.3d 93, 100 (2d Cir. 2002) (citing with approval United States v. Marek, 238 F.3d 310, 320 (5th Cir. 2001)); see also United States v. Gilbert, 181 F.3d 152, 158-59 (1st Cir. 1999) (finding that use of telephone to make in-state bomb threat was sufficient to sustain jurisdiction under the interstate commerce clause under 18 U.S.C. § 844(e)).

   The Court agrees with the majority of circuits, and finds no real statutory ambiguity in § 1958.  As Marek noted, "'in interstate or foreign commerce' is an adjective phrase that modifies 'facility,' the noun that immediately precedes it — not

11

an adverbial phrase that modifies the syntactically more remote verb, '[to] use.'" Marek, 238 F.3d at 316. In the legislative history of § 1958, Congress used the phrases "facility of interstate commerce" and "facility in interstate commerce" interchangeably. See id. at 321. Congress clarified its intent, moreover, when it imported the language of § 1958(a) into a 1990 Amendment of 18 U.S.C. § 1952 to make clear that intrastate mailings were covered under the Act. See id. at 318. As the Fifth Circuit observed, in this context "the inconsistency between § 1958(a) and (b)(2) [is] more apparent than real," and "was not intended by Congress to limit the scope of the statute." Id. at 320.

There was evidence at trial from which a jury could conclude that Jose Antonio Perez used a land line phone from Perez Auto to call Teddy Casiano, and that the phone (a SNET telephone) was an "interstate facility" even when being used for an intrastate phone call. See generally Testimony of Theresa Brown, Southern New England Telephone Company, Trial Transcript Vol. XI [Doc. # 625] at 2490-98. As a result, there is no basis to set aside defendant's conviction on Count Three.

**C.  Count Four — Sufficiency of Evidence of Motive**

Finally, defendant's assertion that the Government did not meet its burden of proving that his actions were taken for the purpose of increasing or maintaining his position in the Perez

12

Organization is also without merit. Defendant argues that "[u]nlike the situation in many drug organizations or gangs, Tony Perez was not required to do anything to remain in a part of the organization, because it was controlled by his brother, Wilfredo Perez." Def. Supp. Mem. [Doc. # 864] at 29. There was evidence, however, Jose Antonio Perez was "like a supervisor" for the Perez Organization's operations at the Hour Glass Café,[6] Testimony of Ollie Berrios, Trial Transcript Vol. VIII [Doc. # 621] at 1653, and that Jose Antonio Perez was mad at Casiano for having stolen the Perezes' narcotics. See, e.g., Testimony of Edwin Barreto, Trial Transcript Vol. IV [Doc. # 616] at 783 ("They were talking about like the cocaine that Teddy had ripped off from Tony, and Tony was pissed off at Teddy because they had like kidnapped one of the guys that were bringing the cocaine and took him to a motel and they ripped him off. You know, he wanted that back . . . "). There was, in fact, a fight at the Hour Glass Café between the Perez Organization and the Savage Nomads, Casiano's gang, in which Casiano signaled his intent to take over the Hour Glass

---

[6] Sergeant Michael Shanley also testified as to Jose Antonio Perez's role in the Perez Organization. Shanley, serving as an undercover officer, purchased cocaine on a number of occasions at the Hour Glass Café, which served as the base for the Perez Organization's drug operation. Jose Antonio Perez was often present at the Hour Glass Café, and Shanley observed instances in which a dealer, after selling Shanley cocaine in the men's room, would return to the bar area and "hand Tony Perez a large wad or handful of monies." Trial Transcript Vol. I [Doc. # 613] at 111; see also id. at 115.

Café.  After this fight, Raul Filigrana testified that he observed Jose Antonio Perez, Wilfredo Perez, and others in a state of preparation for "sort of a war":

> A. One time in 1995 I met Wilfredo in a house at the ball park an there were other people in the house, and the windows were closed, and they were looking out the windows and they were — they had guns, and I ask him what was go on and he told me that they had some sort of problem, that they were expecting sort of a war.
> Q. All right, who told you that?
> A. Wilfredo.
> Q. And you said there were some people there.  Who else was there that you recognized?
> A. Tony was there.
> . . .
> Q. Did you see Tony with any guns?
> A. Not — no, I don't remember.
> Q. Did you see guns at the apartment?
> A. Yes, sir.
> Q. Can you describe what you saw?
> A. I saw a shotgun at the front door.  I saw — I think it was an AK-47 at the table.  Wilfredo had a pistol on his belt.
> Q. And you said a shotgun by the front door.  What type of shotgun; if you recall?
> A. One of those pump shotguns.
> . . .
> Q. Okay.  Did Wilfredo ever tell you there had been a fight at the bar?
> A. Yes.
> . . .
> Q. And what did he tell you?
> A. He told me that not only the person who stole the drugs stole the drugs, but now he wanted to kick him out of the bar.  Q.  And who is that person, according to what Wilfredo said?
> A. Teddy Casiano.
> Q. And what about a fight?
> . . .
> A. They were making fun of him and they wanted to kick him out of the bar so they could take over the bar, and that's when sort of a gang fight started in there.

Trial Transcript Vol. V [Doc. # 618] at 1028-1030.

The Second Circuit has broadly construed the motive element of the VICAR murder statute. In <u>United States v. Concepcion</u>, 983 F.2d 369 (2d Cir. 1992), the Court reviewed the legislative history and concluded:

> With respect to the motive element, the legislative history contains no indication that Congress meant to require proof that self-promotion was the defendant's only or primary concern. Rather, the history states that this phrase was included as a means of proscribing murder and other violent crimes committed as an integral aspect of membership in such enterprises. Given this explanation and given that Congress intended RICO, which § 1959 complements, to be liberally construed to effectuate its remedial purposes, we reject any suggestion that the "for the purpose of" element requires the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive.

<u>Id</u>. at 381.

In <u>Concepcion</u> and subsequent cases, the Second Circuit has found the motive requirement satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." <u>Id</u>.; <u>see</u> <u>also</u> <u>United States v. Dhinsa</u>, 243 F.3d 635, 671 (2d Cir. 2001); <u>United States v. Diaz</u>, 176 F.3d 52, 94-95 (2d Cir.1999).  The Government satisfied this burden in this case. Based on the evidence presented at trial, it was reasonable for the jury to conclude that Casiano's murder was a "violent crime[] committed or sanctioned by [a] high ranking leader[] of the enterprise for the purpose of protecting the enterprise's

operations and furthering its objectives," <u>Dhinsa</u>, 243 F.3d at 671 (citations omitted), thereby satisfying this element of the VICAR offense.

Inasmuch as each of defendant's claims of a failure of proof is unavailing when viewing the evidence in the light most favorable to the Government, Jose Antonio Perez's Fed. R. Crim. P. 29 motion is DENIED.

                                              IT IS SO ORDERED.

                                                                                /s/
                                        _____
                                        Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 2nd day of November, 2004.**